**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MIKE DIXON, | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:24-cv-1891** |
| | : | |
| v. | : | **Judge Algenon L. Marbley** |
| | : | |
| EXEL, INC. *dba* DHL SUPPLY CHAIN, | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendant.** | : | |

**OPINION AND ORDER**

This matter comes before this Court on Defendant Excel, Inc.'s ("DHL") Motion for Summary Judgment. (ECF No. 17). Plaintiff Mike Dixon is a former DHL employee, suing DHL for retaliation, age discrimination, disability discrimination, failure to accommodate, and interference with the Family Medical Leave Act in connection with his termination. (*See* ECF No. 1 at 9–21). Dixon was fired after performing a Nazi salute; Dixon claims he was protesting swastikas on a Diwali banner, and that he was really terminated because of his age, his medical issues, and his regular leave. For the following reasons, DHL's motion is **GRANTED.**

## I. INTRODUCTION

The swastika's notoriety in the West today stems from its symbolic role representing Nazi Germany through the "swastika flag of the Third Reich." *United States v. Knauer*, 149 F.2d 519, 521 (7th Cir. 1945). Nazi Germany's infamous angled swastika was known as the *Hakenkreuz*, and the Third Reich government of Germany displayed it most prominently on a new German flag, which displayed a black *Hakenkreuz* in a center circle of white, surrounded by a field of red. Thus, a *Hakenkreuz* swastika may literally invoke the period of totalitarian and fascist government in Germany in the 1930s and 1940s.

1

In the West, swastikas tend to be seen as Nazi symbols even when they are not literally the same as the *Hakenkreuz*.  The swastika, the Nazi salute, and Nazi greetings of *Sieg Heil* or *Heil Hitler*, connote genocide, political persecution, and white supremacy, "as well as . . . oppression and genocide directed toward racial, religious and ethnic minority groups."  *Hoeft v. Lewallen*, 2010 WL 1687871, at *1 (W.D. Wis. Apr. 23, 2010); *Murray v. Sears, Roebuck & Co.*, 2010 WL 1433426, at *12 (N.D. Ohio Apr. 7, 2010) ("It is well-understood that 'sieg heil' is synonymous to Heil Hitler, especially when accompanied by the Nazi salute or Hitler salute.").  Thus, even more than eighty years following the end of the Second World War, the swastika remains steeped with negative associations to many people in the United States—along with any utterance or gesture that is reminiscent of Nazi greetings.  *E.g.*, *Florio v. Gallaudet Univ.*, 119 F.4th 67, 78 (D.C. Cir. 2024) ("Some observers might conclude that the continued use of a gesture that appears indistinguishable from a Nazi salute . . . warrants the harsh condemnation of loaded epithets."); *Dickinson v. Austin*, 942 F.2d 791 (Table), 1991 WL 166411, at *2 (9th Cir. 1991) ("[T]he swastika today is a potent symbol of intolerance, hatred, and violence.").

For many others, however, the swastika is not an immediately potent symbol of Nazism, persecution, or racial supremacy.  Outside the West, the swastika remains a symbol of "ancient [and] historic origins," *Dickinson*, 1991 WL 166411, at *2, and is "used in several religions, such as Buddhism, Hinduism and Jainism," *Hoeft*, 2010 WL 1687871, at *1.  Hinduism is a major world religion, with approximately one billion adherents worldwide.  *See Goswami v. Holder*, 598 F. App'x 430, 430 (6th Cir. 2015).  It is also the majority religion of Nepal, a South Asian country of approximately 30 million people, just north of India in the Himalayan mountains.[1]  And Diwali is

---

[1]  U.S. State Dep't, *Nepal 2023 Int'l Religious Freedom Report* 3–4 (2024), https://www.state.gov/wp-content/uploads/2024/04/547499-NEPAL-2023-INTERNATIONAL-

"a major religious festival in Hinduism, . . . typically celebrated in late October or November."

*Saggu v. Dejoy*, 2021 WL 1165106, at *3 n.7 (N.D. Ill. Mar. 26, 2021).

## II.    BACKGROUND

### A.  Dixon's Employment History and Alleged Discrimination

Plaintiff Mike Dixon was an operations supervisor and training supervisor at DHL.  He joined DHL in Atlanta, Georgia in 2018 after a forty-year career in education.  Just after he joined DHL in Georgia, Dixon was diagnosed with partial peripheral neuropathy, a condition where nerve damage causes pain, and he requested accommodations.  (ECF No. 27 at 3).  At that time, Dixon's "medical provider advised that he take short rests to get off of his feet, use standing mats, get better padded shoes, use compression socks, and prescribed medication for the pain."  DHL's site in Georgia provided Dixon with a standing mat, shoes, and use of a chair.  (*Id.* at 3–5).  Dixon made one formal accommodation request in a 2019 interactive process questionnaire, where it was recommended that Dixon be provided with a stool to sit down when needed.  (ECF No. 17-1 at ¶ 8).

In July 2021, Dixon moved from Georgia to DHL's site in Canal Winchester, Ohio.  When Dixon transferred to Ohio, he requested that his accommodations continue.  At the new site, Dixon was named "security champion," making him responsible for coordinating site security between DHL corporate, DHL's security provider GardaWorld, and customers.  (ECF No. 27 at 3–5).

In June 2022, Dixon's disability symptoms had worsened, and he sought medical leave for pain.  Reece Clemens, Canal Winchester's new general manager, denied Dixon's request for a week of unpaid leave; Thomas Tyler, his human resources manager at the time, informed Dixon

---

RELIGIOUS-FREEDOM-REPORT.pdf (last visited Jan. 9, 2026); Kanak Bikram Thapa, *Religion and Law in Nepal*, 2010 B.Y.U. L. Rev. 921, 921 (2010).

that he may want to research the Family Medical Leave Act. Dixon applied for and was approved for intermittent leave from June 2022 through June 2023. Dixon was able to use intermittent leave from June 2022 until May 2023 without issue. (*Id.* at 5).

Giana Parsons joined the Canal Winchester site in May 2023 and replaced Tyler as the human resources manager; Parsons had recently become a human resources manager at DHL in December 2022. Shortly after joining, Parsons reviewed a recent complaint against Dixon, and asked Clemens if Dixon was "on any disciplinary corrective actions or PIPs" considering Dixon's apparent history of incidents. (*Id.* at 5–6). Employees had raised complaints about Dixon in the past related to his behavior. (Dixon Dep. 178–79; Clemens Dep. 24–29; Parsons Dep. 30–31, 41–60).[2]

During this time, Dixon was again approved for intermittent Family Medical Leave Act for a period from June 2023 through June 2024, and Dixon began utilizing this leave time. In late July, Parsons began drafting disciplinary coaching for Dixon to complete with Dixon's new supervisor, Jacob Burghard. Dixon submitted a request for medical leave on July 26, 2023. Just a few days later, on August 1, Burghard presented Parsons' corrective coaching to Dixon. Dixon responded to the coaching, noting his concern that months-old incidents were being addressed "only after my focused push for continuance of my FMLA and most recent [short term disability] request." He also objected to comments that he was "of a certain age" or an "old man." (ECF No. 27 at 6–7; Dixon Dep. 127–133).

Despite Dixon's coaching for those incidents and the concerns Dixon raised about his coaching, Dixon continued to take intermittent FMLA leave throughout early August. Due to

---

[2] Dixon's Deposition is ECF No. 19, Clemens' Deposition is ECF No. 20, and Parsons' Deposition is ECF No. 22. Burghard's Deposition is ECF No. 21, Bernadin's Deposition is ECF No. 23, and Holley's Deposition is ECF No. 24.

worsening symptoms, Dixon took a month of FMLA leave from mid-August through mid-September.  While on medical leave, Dixon was informed by his physician that he needed to have hip surgery "in the near future around January 2024."  Shortly after Dixon returned to DHL, his medical provider recommended that his hip surgery occur in December 2023, not January 2024, and Dixon communicated this to Clemens and Parsons.  (ECF No. 27 at 6–8).  Dixon claims that Clemens requested that he try to delay his surgery because December was the busy season; he suggests that others in management "expressed their displease through non-verbal cues."  (*Id.* at 9).

Dixon also claims that upon his return, Clemens called him an "old man."  Moreover, Dixon's repeat use of leave caused Parsons "took away his training supervisor responsibilities" due to the "uncertainty of [Dixon] being out for FMLA."  Reece also apparently characterized Dixon's leave as "disruptive" and asked for specific times when Dixon would need leave, which Dixon was unable to provide.  (Dixon Dep. 55, 97–98).  Burghard gave Dixon more tasks that required him to be on his feet and made general comments about Dixon's age.  (Dixon Dep. 98).  Burghard knew about Dixon's medical condition, and "tried to clarify with [Dixon] that if [Dixon] [was] in pain," he should not do the additional tasks.  (Burghard Dep. 70).  According to Dixon, he reported repeat comments about his age to Parsons, yet Parsons failed to investigate them.  (Dixon Dep. 90–91; ECF No. 27 at 8).

Dixon was able to use his intermittent leave as needed throughout the remainder of September and October.  However, DHL management would complain about Dixon's frequent FMLA usage and made comments suggesting Dixon was abusing his leave.  (Bernadin Dep. 45–47; Dixon Dep. 112, 115–16).  DHL management also would make a variety of comments about Dixon's age—his former manager would ask him when he was "thinking about retiring," another

colleague sent him a text following the birth of his granddaughter stating "Now you can retire," and Burghard called him a "senior" and observed that "most people [Dixon's] age are retired now." (Dixon Dep. 128, 138–39). According to Dixon, younger employees were treated better than him: other supervisors were offered overtime, unlike Dixon, and there were trainings and social events, like lunches, that Dixon was not invited to attend. (*Id.* 149–52; ECF No. 27 at 9–10).

Dixon reported his concerns about discrimination and unfair treatment to Parsons, Burghard, and Clemens. These individuals knew about Dixon's frequent intermittent medical leave, his recent month of leave, and his need for an upcoming hip surgery. (Dixon Dep. 131). Yet his treatment did not change. (ECF No. 27 at 10).

### B. The Nepali Banner

The DHL Canal Winchester site has a substantial population of Nepali employees. On the weekend of November 12, 2023, a group of Nepali employees hosted a Diwali celebration at the Canal Winchester site. One of these employees, Khem Chamlagai, decided to get a celebratory Diwali banner for the occasion. He purchased a small purple and gold banner with "Happy Diwali" in Nepali script and hung it on the security desk in the entrance to the site. (ECF No. 17 at 3; ECF No. 17-1 at ¶¶ 9–10, 23).

When Dixon arrived at the site on November 14, 2023, he saw the Diwali banner but did not know what it was for. He also noticed that the banner had a pattern of small swastika symbols on it. (*See* Appendix). Dixon was "deeply offended" for several reasons. First, Hamas had recently launched an attack on Israel that renewed discussions of antisemitism and violence against Jewish people; accordingly, the news had been discussing how the swastika was a symbol of the Nazi party and hatred, particularly against Jews. Second, Dixon's uncle was killed during the Second World War while fighting in Europe, and Dixon's father instilled in Dixon that the swastika

6

was unacceptable. Third, DHL was a German company, and Dixon knew that it had Jewish employees; "he felt [this was a] very serious situation [that] needed to be addressed immediately." Dixon states that "[i]t never occurred to [him] that the swastika could be associated with something other than the Nazi party." Dixon believed that people would be offended when they saw the symbol. He also feared that the symbol would violate DHL's work rules prohibiting discrimination and harassment. (ECF No. 27 at 11; *see* generally ECF No. 17 at 4).

Dixon discussed the banner with Michael Holley, the security guard on duty from GardaWorld. Holley agreed that it was the swastika symbol associated with Nazis. (ECF No. 27 at 11; Dixon Dep. 184–91; *see* Holley Dep. 52). A small group of people—including Dixon, Holley, and DHL customers—discussed the banner and its swastika symbols. Ryan Bernadin was a Carhartt employee and DHL customer who observed the banner. Bernadin believed it contained Nazi symbols and noted that "[p]robably half" of the people who saw the banner and its swastikas felt it was inappropriate, including Dixon—although one observer mentioned "it was a Diwali symbol." (Bernadin Dep. 81–83, 108; ECF No. 27 at 11).

Clemens, the general manager, arrived at the office, and Dixon brought the banner to him. Clemens instructed Dixon to take it to human resources. (ECF No. 17 at 4). Dixon brought the banner to Parsons when she arrived that morning. Parsons was surprised; she asked Dixon if he knew who put the banner up, before stating that the symbol "may not mean what [Dixon] thought it meant." (ECF No. 27 at 12). Parsons informed Dixon that a group of Nepali employees had hosted a Diwali celebration that prior weekend, and that the banner could be associated with Diwali. She then began researching the meaning of the symbol, and Dixon returned to the group of people at the security desk, bringing the banner back from Parsons' office and displaying it to DHL employees, customers, and contractors. (ECF No. 17 at 4–5). Several witnesses observed

7

that Dixon and others had been smirking or laughing, as they discussed the Diwali banner.  (ECF No. 17 at 5; Holley Dep. 66–67; Bernardin Dep. 91–92).

Parsons determined that the swastika symbol was used in Nepal and had a meaning distinct from its use in Nazi Germany.  She then went to the security desk and began reading the Google search results from her phone to the group of people, telling Dixon that "too many people look for the bad instead of the good in symbols."  Bernadin characterized Parsons' attitude as "combative," and to Holley, it seemed that Parsons was not listening to Dixon or taking his concerns about the swastika seriously.  (Bernadin Dep. 109–11; Holley Dep. 87).  Dixon quickly interrupted Parsons as she was speaking.  (Parsons Dep. 94; ECF No. 17-1 ¶ 13).  He also performed a Nazi salute— all within five seconds of her arriving.  (*See* Appendix).  According to some witnesses, Dixon may have said "Sieg Heil" while interrupting Parsons, and though Dixon did not recall saying it, he admitted that he may have heard the phrase from "army movies."  (*Compare* Holley Dep. 62–63 *with* Dixon Dep. 207–08).  Dixon claims that he felt as though his concerns were not being taken seriously.  He also claims that his Nazi salute drew on his teaching experience to make a pedagogical point to Parsons, so that she would understand what others saw in the symbol.  (Dixon Dep. 209–11; ECF No. 27 at 12–13).

According to Holley, it did not seem like Parsons or anyone else in the room was intimidated by Dixon's demonstration.  (Holley Dep. 90).  Dixon testified that he was frustrated with Parsons and admitted he was being a "smart-aleck."  He asked Parsons if he could wear the swastika on his shirt at the DHL site, to which Parsons said no.  (Dixon Dep. 204, 209; *see* Bernadin Dep. 96).  Parsons returned to her office and sent Dixon an email thanking him for bringing the swastikas on the banner to her attention, informing him that DHL would conduct and investigation, and asking him not to share the situation during the investigation.  Parsons then investigated the

8

incident and began looking into Dixon, believing that his conduct was discriminatory in violation of DHL's policies.  (ECF No. 27 at 13–15).

### C.  Dixon's Firing

Parsons' investigation evaluated Dixon's actions under DHL's antidiscrimination policy and DHL's workplace harassment policy.  DHL's General Work Rules Policy provides that certain rule violations are grounds for termination the first time they happen, including workplace harassment.  (ECF No. 17 at 2).

DHL's Anti-Discrimination Policy, which is found within DHL's Equal Opportunity Employer Policy, provides:

> It is DHL Supply Chain policy not to discriminate against any associate or applicant for employment because of race, color, religion, sex (including pregnancy, sexual orientation and gender identity), marital status, national origin, citizenship or immigration status, age, disability, military status, genetic information or any other basis prohibited by law.

(ECF No. 27-34 § 1.1).  Similarly, DHL's Workplace Harassment Policy states that "no associate may engage in conduct that falls under the definition of prohibited workplace harassment"—and workplace harassment is defined as:

> [U]nwelcome or unsolicited speech or physical conduct based upon race, color, religion, sex (including pregnancy, sexual orientation and gender identity), marital status, national origin, citizenship or immigration status, age, disability, military status, genetic information or any other basis prohibited by law that has the purpose or effect of interfering with an individual's work performance or creates an intimidating, hostile or offensive working environment.

(ECF No. 27-35 §§ 1, 2.1).  Dixon was aware of these policies and agreed to comply with them. (ECF No. 17 at 2; *see* Dixon Dep. 44–45, 250–51).

While she was beginning her investigation into the swastikas on the banner, Parsons also began investigating Dixon.  When she had been reading from her phone by the security desk, she

9

noticed Dixon raising his arm and heard him say "Sieg Heil," and suspected that he had performed a Nazi salute. She reviewed the security footage and confirmed her suspicions. Thereafter, Parsons began to investigate Dixon on the basis that his demonstration harassed those who witnessed it; though it appears that Parsons was the only one who was offended. According to Parsons, Dixon's Nazi salute and demonstration was "extremely offensive" and caused her to feel emotionally and psychologically unsafe. (Parsons Dep. 100–01, 126–27; ECF No. 27 at 15).[3] Parsons felt that Dixon's actions warranted "immediate termination," and she promptly sought "documentation" on Dixon. (Parsons Dep. 102; Clemens Dep. 48). The security footage also showed Michael Holley (the security contractor from GardaWorld) performing what appeared to be a Nazi salute three times, (*see* Appendix), though no action was taken against Holley at that time. (ECF No. 27 at 17–18). Holley was later removed in April 2024 when Dixon filed his complaint in this action. (*Id.* at 18). Apparently, DHL was unaware that Holley had also performed a Nazi salute until this lawsuit commenced.

DHL management—including Parsons, Clemens, human resources director Greg Bline, human resources vice president Ericka Duron, general manager Michael Walling, and director of operations Justin Kastman—determined that DHL would terminate Dixon. (Clemens Dep. 32–33; Parsons Dep. 66–67; ECF No. 17 at 8–9). DHL's decision to fire Dixon was made on November 21, although no action was taken against him that day. (ECF No. 17-1, Ex. 6 at 2; Parsons Dep. 131–32; Clemens Dep. 33). At 9 a.m. on November 22, Dixon submitted a request for leave for her hip surgery scheduled for January 2024. At noon, he was fired by Parsons and Clemens. (ECF No. 27 at 17). Dixon filed suit in April 2024. (*See* ECF No. 1).

---

[3] Upon learning of Dixon's conduct, members of DHL's management who were not present were also shocked, disappointed, and offended. (*E.g.*, Clemens Dep. 60–61, 70).

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's function at the summary judgment stage is not "to weigh evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Courts ask whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Summary judgment is inappropriate "if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In such a case, there is an issue for trial because "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," but evidence that is "merely colorable" or "not significantly probative" is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment carries the initial burden of presenting law and argument in support of its motion, as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). "If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial." *Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 525 (S.D. Ohio 2023) (Marbley, J.) (citing Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250).

Factual evidence is viewed "in the light most favorable to the non-moving party," and "all reasonable inferences" are drawn in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502,

511 (6th Cir. 2009). A mere "scintilla" of evidence supporting the nonmoving party's position is insufficient—"there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### IV. LAW AND ANALYSIS

Dixon brings a variety of claims against DHL. He asserts the following counts:

I. Retaliation under Title VII of the Civil Rights Act for opposing and reporting discrimination;
II. Retaliation under Ohio Rev. Code § 4112.02 for opposing and reporting discrimination;
III. Age discrimination under Ohio Rev. Code § 4112.02;
IV. Age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*;
V. Disability discrimination under Ohio Rev. Code § 4112;
VI. Failure to accommodate under Ohio Rev. Code § 4112.02;
VII. Retaliation under Ohio Rev. Code § 4112.02 for medical leave;
VIII. Disability Discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*;
IX. Failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*;
X. Retaliation under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*;
XI. Interference in violation of the Family Medical Leave Act, 29 U.S.C. § 2615;
XII. Retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2615.

The parties agree that most of the claims are subject to the *McDonnell Douglas* burden-shifting analysis, but that Dixon's failure to accommodate claims (Counts VI and IV) are subject to the direct evidence test. (ECF Nos. 17 at 9; *id.* at 9 n.1; 27 at 18–19). Although Dixon does not clearly state what he believes the proper approach would be for his FMLA interference claim (Count XI), DHL appears correct that *McDonnell Douglas* would apply. (ECF No. 17 at 10 (citing *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 400–01 (6th Cir. 2019)).

### A. Burden-Shifting Analysis

The majority of Dixon's claims are claims for discrimination or retaliation subject to the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981).

Under *McDonnell Douglas*, Dixon bears the burden of establishing a *prima facie* case. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) ("[W]e examine Title VII, ADEA, and Ohio state-law retaliation claims under the same *McDonnell Douglas/Burdine* evidentiary framework that is used to assess claims of discrimination."); *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 735 (6th Cir. 2015) ("Claims brought under the ADA are evaluated under the *McDonnell-Douglas* burden-shifting regime."); *Marshall v. Rawlings Co.*, 854 F.3d 368, 381–82 (6th Cir. 2017) (FMLA retaliation); *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (FMLA interference); *e.g.*, *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 485 (6th Cir. 2010) (age discrimination).

If Dixon makes a *prima facie* case, the burden shifts to DHL to articulate a legitimate non-discriminatory reason for terminating Dixon's employment. *Imwalle*, 515 F.3d at 544. If DHL satisfactorily articulates such a reason, then the burden shifts back to Dixon to argue that DHL's offered termination reason was merely a pretext for unlawful discrimination or retaliation. *Id.*

### 1. Counts I and II for Retaliation Fail.

First, Dixon brings claims for retaliation for opposition of religious and national origin discrimination under Ohio Rev. Code § 4112.02 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3. To establish a *prima facie* claim of retaliation, Dixon must show that: (1) "he engaged in activity protected by Title VII"; (2) "his exercise of such protected activity was known" by DHL; (3) DHL "thereafter . . . took an action that was 'materially adverse'" to Dixon; and (4) "a

causal connection exist[s] between the protected activity and the materially adverse action." *Laster v. Cty. of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citations and internal quotation marks omitted).[4] DHL argues that Dixon cannot establish the first and fourth elements: that he engaged in a protected opposition activity, and that a causal connection exists between his protected activity and the materially adverse outcome. If Dixon establishes these elements, the burden shifts to DHL to articulate a legitimate reason for terminating Dixon. But Dixon has not established a *prima facie* case of retaliation because he cannot show that his Nazi salute was a protected activity, and therefore he also has not shown a causal connection between any protected activity and his firing. Counts I and II fail because Dixon has not made his *prima facie* case.

**Element 1.** DHL first challenges whether Dixon has shown that he engaged in a protected activity. To satisfy the first element, Dixon must show that the manner of his opposition is "reasonable" and based on "a reasonable and good faith belief that the opposed practices were unlawful." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000); *Jackson v. Genesee Cnty. Rd. Commission*, 999 F.3d 333, 345 (6th Cir. 2021).

DHL challenges Dixon's opposition as unreasonable. DHL points out that Dixon continued to show the Diwali banner after he removed it from the security desk and brought it to Parsons' attention, and after he raised concerns that others might see it, calling into question whether Dixon really had a reasonable and good faith belief that the Diwali decoration was discriminatory. (ECF No. 17 at 11–12). Even if Dixon reasonably believed that the Diwali banner was discriminatory, DHL suggests that "there can be no dispute that Dixon failed to express his supposed concern in a reasonable manner"—pointing out that Dixon's actions in giving a Nazi salute, exclaiming "Sieg

---

[4] Ohio courts look to federal caselaw in interpreting violations of § 4112. *Isensee v. Amplity, Inc.*, 2024 WL 2132419, at *3 (S.D. Ohio May 13, 2024); *see Bobnar v. AstraZeneca Pharms. LP*, 758 F. Supp. 3d 960, 714 n.17 (N.D. Ohio Nov. 26, 2024) (collecting cases).

14

Heil," and asking Parsons if he could wear a swastika on site in front of a group of people including customers and colleagues was highly inappropriate and offensive. (ECF No. 17 at 12). DHL argues that Dixon is not protected in protest when he "violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals." (ECF No. 17 at 11 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (internal quotation marks omitted)).

For his part, Dixon counters that he had a reasonable and good faith belief that the swastikas on the Diwali banner were discriminatory, including because his uncle died fighting against the Germans in the Second World War. He points out that the swastika "is universally recognized as a symbol of hate and anti-Semitism," and that many others who viewed the banner initially thought it was an issue, too. (ECF No. 27 at 21–22). Dixon also asserts that he was explaining what the swastika meant to him because he feared Parsons was not taking his concern seriously.

There is no genuine issue of material fact here for a jury to decide, and DHL is entitled to summary judgment on these counts. Dixon did not engage in a protected act: his actions in performing the Nazi salute *after* he had removed the Diwali banner were patently unreasonable given the manner and location of the protest. Dixon gave a Nazi salute to Parsons in front of DHL colleagues and customers while she was trying to address his concern with the swastikas in the Diwali banner. This expression was not "reasonable," *Jackson*, 999 F.3d at 345, and it certainly violated DHL's legitimate rules and disrupted the employment environment. *Booker*, 879 F.2d at 1312. No reasonable juror could conclude that Dixon engaged in a protected activity, because no reasonable juror could determine that he opposed unlawful DHL practices in a reasonable manner. *Jackson*, 999 F.3d at 346; *see Scott v. Presrite Corp.*, 2024 WL 3179690, at *6 n.4 (N.D. Ohio June 26, 2024) (a manner of opposition can be unreasonable as a matter of law). The nature of Dixon's

actions is contradictory: he claims to have believed that the swastikas on the banner were discriminatory, and raised that issue with DHL management, and yet he *returned* to the entrance with that banner and performed a Nazi salute in front of others. This fundamentally erodes any explanation he offers as to the reasonableness of his method of "explaining" to Parsons what the swastika meant to him. Dixon's form of protest was extreme and unreasonable as a matter of law, and his actions contradict his rationale for removing the banner from public view in the first place.

True, Dixon was reacting to what is, in the West, an extreme and "widely recognized hate symbol." *Sherzad v. Pettigrew*, 2025 WL 3101690, at \*6 (D. Minn. Oct. 30, 2025); *see Hoeft*, 2010 WL 1687871, at \*1. Yet his form of protest was unreasonable because the Nazi salute is a related, well-known symbol of hate. *Murray*, 2010 WL 1433426, at \*8, \*12 (granting summary judgment on retaliation claims because even if plaintiff gave a Nazi salute and said "sieg heil" to protest what he believed were "Gestapo"-like actions of his employer, a Nazi salute and greeting were enough to justify his termination); *Hoffman v. Prof. Med. Team*, 394 F.3d 414, 421 (6th Cir. 2005) ("Disruptive conduct, even when it occurs in the context of employee protest, is widely viewed . . . as a legitimate ground for termination."). An employee "strips away protections against retaliation" when he raises a complaint in a way that is "so disruptive or insubordinate" that it implicates an employer's ability to take adverse action and "preserve a workplace that is governed by rules, subject to a chain of command, free of commotion, and conduct to the work of the enterprise." *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000). DHL policy prohibited workplace harassment, including "speech or physical conduct" that might be based on a variety of protected characteristics and would "ha[ve] the purpose or effect of interfering with an individual's work performance or creates an intimidating, hostile, or offensive work environment." (ECF No. 27-35

16

§§ 1, 2.1). Undoubtedly, Dixon's actions here were excessive, disruptive, insubordinate, and effectively made his continued employment untenable by creating an offensive work environment.

Moreover, the location of his protest also rendered it unreasonable because it was at the site entrance, in full view of DHL customers. The "manner in which" Dixon complained placed his "activity outside the protection of Title VII." *Payne v. WS Servs., LLC*, 216 F. Supp. 3d 1304, 1318–19 (D. Okla. 2016). In *Payne*, the court determined that a plaintiff who "took to Facebook and public streets to air her grievances" with an employer, including by "wearing a homemade sandwich board" to accuse the employer of not hiring women had not engaged in a protected activity *even if* her actual statements or allegations "fall short of rendering her conduct unreasonable." *Id.* So too, here. Even if Dixon's action in performing a Nazi salute to protest the Diwali banner was not in and of itself unreasonable, it certainly became unreasonable by virtue of the location in which it was performed. Dixon had a multitude of other options—aside from giving a Nazi salute—if he believed that Parsons did not understand his concerns. He could have simply left the room and reported the incident to Clemens. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566–67 (2d Cir. 2000) (Sotomayor, J.) (slapping harasser not a protected activity even if done so in response to harassment where individual could have left the room and reported the incident). Under these circumstances, his protest also was not reasonable because of its location.

This Court is mindful that it must carefully balance DHL's "need to maintain an orderly workplace" with "the equally compelling need of employees to be properly safeguarded against retaliatory actions." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 722 (6th Cir. 2008). Construing the evidence in the light most favorable to Dixon, the nonmovant, and considering the particular circumstances of his protest, Dixon's protest was fundamentally unreasonable and not a protected activity. His Nazi salute was done in an "insubordinate and antagonistic manner," *Gogel*

17

*v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1140–41 (11th Cir. 2020), and was a "drastic action[]" so "disproportionate and unreasonable under the circumstances" that it cannot be protected oppositional activity. *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998). If he truly needed to express what the swastika meant to him, he had to do so in a different way. Here, all the evidence shows that DHL terminated Dixon due to the disruption he caused in the workplace, not out of retaliation for engaging in protected activities. *Walker v. Ohio Nat'l Life Ins. Co.*, 2024 WL 4363233, at *9 (S.D. Ohio Sept. 30, 2024). That alone dooms these counts. Though DHL also calls into question Dixon's asserted reasonable and good faith belief that the Diwali banner was discriminatory, this Court need not decide that issue, because even if Dixon reasonably believed that the banner was discriminatory, that belief would not save his retaliation claim.

Because Dixon cannot establish the first required element of a *prima facie* case, this Court need not consider whether he has established the fourth element, nor does the burden shift to DHL under *McDonnell Douglas* to articulate a legitimate non-discriminatory reason for terminating Dixon's employment. DHL's Motion for Summary Judgment is granted on Counts I and II.

### 2. Counts III and IV for Age Discrimination Fail.

Next, Dixon brings claims for age discrimination violations under Ohio Rev. Code § 4112 and the federal Age Discrimination in Employment Act, 29 U.S.C. § 623. Ohio's age discrimination law is "parallel" to the federal analysis. *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005). To establish a *prima facie* case of age discrimination, Dixon must show that he: (1) "was at least 40 years old at the time of the alleged discrimination"; (2) "faced an adverse employment action"; (3) "was otherwise qualified for his position"; and (4) "was replaced by someone 'significantly' younger or that similarly situated younger employees were treated more

18

favorably." *Tschappatt v. Crescent Metal Prods., Inc.*, 798 F. App'x 887, 888–89 (6th Cir. 2020) (citation omitted). DHL challenges the fourth element, and Dixon has not made the requisite showing to make a claim for age discrimination.

DHL argues that Dixon has failed to establish a prima facie case of age discrimination under *Tschappatt* because he cannot establish the fourth element. DHL points out that nobody was hired to backfill Dixon's position after he was terminated. (ECF Nos. 17-1 ¶ 22; 17 at 17–18). Moreover, according to DHL, Dixon has not shown "that a similarly situated younger employee was treated more favorably" because he has not shown an employee similar in all respects. (ECF No. 17 at 18).

Meanwhile, Dixon argues that he has established a prima facie case for age discrimination, and cites to the syllabus in *Swierkiewicz v. Sorema N.A.* for the proposition that he needs to establish "circumstances that support an inference of discrimination" for the fourth factor. (ECF No. 27 at 45 (quoting 534 U.S. 506, 506 (2002) (internal quotation marks omitted)). He points to the circumstances supporting the inference of age discrimination in this case, including the fact that both Clemens and Burghard made comments about his age. (ECF No. 27 at 46).

But *Swierkiewicz* governed the pleading standard applicable to a motion to dismiss and not the evidentiary standard relevant for summary judgment. *Swierkiewicz*, 534 U.S. at 510–11. It is entirely inapposite here and provides the wrong standard. Dixon fails to identify a younger employee who replaced him, or even provide evidence that he was replaced with a significantly younger employee. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 335–36 (6th Cir. 2003). And to the extent that Dixon suggests that he "was treated worse than his younger colleagues" and identifies Chamlagai and Holley as comparators, (ECF No. 27 at 46; *id.* at 42), he has failed to show that these employees were "similarly situated" to him in all relevant respects. *Tschappatt*,

19

798 F. App'x at 889. Chamlagai posted a Diwali banner to celebrate a Nepali holiday, whereas Dixon admitted to performing a Nazi salute. And Holley was not even employed by DHL—he was a security contractor from GardaWorld. There are no applicable factors to consider for Holley, who is not a colleague of Dixon at DHL. And in evaluating the applicable factors for Chamlagai— supervisor, disciplinary record, misconduct, *Tschappatt*, 798 F. App'x at 889–90; *see Minadeo*, 398 F.3d at 764—this Court concludes that Chamlagai is not similarly-situated to Dixon. Chamlagai's conduct is not remotely the same—nor does it even appear to be misconduct. Appropriate comparators may hold "the same job or level of supervisory authority" or "engage[] in the same type and level of seriousness of misconduct." *Neuhardt v. Charter Comm'ns, LLC*, 2020 WL 996450, at *3 (S.D. Ohio Mar. 2, 2020) (Marbley, J.); *see Dickens v. Interstate Brands Corp.*, 384 F. App'x 465, 468, 470 (6th Cir. 2010). Chamlagai and Holley are not appropriate comparators. Thus, DHL's motion is granted with respect to these counts, too. Dixon has failed to establish a prima facie case for age discrimination, and Counts III and IV fail.

### 3. Counts V and VIII for Disability Discrimination Fail.

Dixon also brings claims for disability discrimination under Ohio Rev. Code § 4112 and the Americans with Disabilities Act, § 42 U.S.C. § 12101, *et seq.* Again, Ohio's disability discrimination law "parallels" federal law, and the analysis is the same. *Belasco v. Warrensville Heights Cty. Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015). To establish a *prima facie* case of disability discrimination, Dixon must show that he: (1) "has a disability"; (2) is otherwise qualified for the job with or without reasonable accommodation"; (3) "suffered an adverse employment decision"; (4) had an employer who "knew or had reason to know of [his] disability"; and (5) "was replaced" or was treated less favorably. *Hrdlicka v. General Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citation and internal quotation marks omitted); *Fair v. Ohio Bell Tel. Co.*, 2024 U.S.

App. LEXIS 18755, at *6 (6th Cir. July 29, 2024).  DHL challenges the first and fifth elements. Again, Dixon fails to make the requisite showing for disability discrimination.

DHL questions whether Dixon actually has a protected disability, before again arguing that there is no factual dispute as to whether Dixon was replaced or treated less favorably than similarly-situated persons.  (ECF Nos. 17-1 ¶ 22; 17 at 20–21).  Dixon counters by asserting that he does not argue replacement, but instead has shown that he was treated less favorably than similarly situated employees.  He argues that his disability, peripheral neuropathy, is clearly established, and suggests that he was targeted for his disability when his accommodations were taken away.  (ECF No. 27 at 41).  Again, he points to Chamlagai and Holley.  He asserts that they are "similarly situated in all relevant respects." (ECF No. 27 at 40–42).

There is no dispute that Dixon was not replaced, and Dixon has not shown that he was treated less favorably than other employees.  As mentioned previously, Chamlagai and Holley are not similarly situated to Dixon.  *See* Section IV(A)(2), *supra*.  Holley is not even an employee of DHL.  And Chamlagai merely hung a banner for the Diwali celebration—he did not perform a Nazi salute in defiance to a human resources manager in front of customers.  Chamlagai and Holley simply are not comparators to Dixon for these purposes.  *Neuhardt*, 2020 WL 996450, at *3; *see Dickens*, 384 F. App'x at 468.  This Court need not decide whether Dixon has a protected disability, because Dixon has not established the fifth element of showing replacement or less favorable treatment.  Thus, he has failed to establish a prima facie case for age discrimination, and Counts V and VIII fail.

### 4.   Counts VII and X for Medical Leave Retaliation Fail.

Dixon separately raises retaliation claims for his taking and requesting of medical leave in violation of Ohio Rev. Code § 4112.02 and the Americans with Disabilities Act, 42 U.S.C. § 12101,

*et seq.* To establish a *prima facie* case for retaliation under these laws, Dixon must show: (1) "he engaged in a protected activity"; (2) DHL "knew of that activity"; (3) DHL "took an adverse employment action"; and (4) "a causal connection between the protected activity and the adverse employment action." *Sharp v. Profitt*, 674 F. App'x 440, 450 (6th Cir. 2016); *accord La Fond v. NetJets Inc.*, 2018 WL 4352776, at *5 (S.D. Ohio Sept. 12, 2018) (Marbley, J.). DHL challenges the first and fourth elements. Dixon also fails to make the requisite *prima facie* showing here.

In challenging the first element, DHL argues that "taking medical leave does not constitute 'oppos[ition] to an unlawful discriminatory practice'" and cites to a prior decision of this Court construing Ohio law. *La Fond*, 2018 WL 4352776, at *6; (ECF No. 17 at 22). Dixon argues that "[a] request for FMLA leave may constitute a reasonable accommodation" and cites to *Hurtt v. Int'l Servs., Inc.* for that proposition. (ECF No. 27 at 43). *Hurtt* is somewhat distinct, because that case determined that a "submission of FMLA leave," alongside verbal requests for a work week accommodation, a doctor's documentation, and another doctor's letter combined could show a good-faith request for reasonable accommodations. 627 F. App'x 414, 422–23 (6th Cir. 2015). Thus, *Hurtt* provides at least some suggestion that medical leaves of absence can constitute reasonable accommodations under certain circumstances. A recent and thorough analysis of the case law in this circuit suggests that "a request for FMLA leave is also a request [for] reasonable accommodation under the ADA[] when the leave is designed to [accommodate] . . . a protected disability (not just a serious health issue under the FMLA)." *Schobert v. CSX Transp. Inc.*, 504 F. Supp. 3d 753, 785–89 (S.D. Ohio 2020).

Regardless as to whether Dixon can show he engaged in a protected activity by requesting medical leave, DHL is correct that Dixon cannot establish a causal link between his medical leave requests and his termination. His Nazi salute certainly is an intervening cause that disrupts the

22

"but-for causation" that Dixon must show to establish causation. *Sharp*, 674 F. App'x at 450; *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 450 (6th Cir. 2020) ("[A]n intervening cause between protected activity and an adverse employment action dispels any inference of causation."). Dixon has failed to establish a prima facie case for medical leave retaliation, and therefore Counts VII and X fail.

### 5. *Count XI for FMLA Interference Fails.*

Dixon also asserts that DHL interfered with his rights under the Family Medical Leave Act, 29 U.S.C. § 2615, including by his termination. To establish a *prima facie* case of retaliation under the FMLA, Dixon must show: (1) "he was an eligible employee"; (2) DHL "was an employer as defined under the FMLA"; (3) he "was entitled to leave under the FMLA"; (4) he "gave proper notice of his intention to take leave"; and (5) DHL "denied [him] [the] FMLA benefits to which he was entitled." *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). DHL argues that Dixon cannot establish the third and fifth elements.

According to DHL, it did not deny Dixon any benefits to which he was entitled because his termination was already in process, and his termination was valid and unrelated to this FMLA. (ECF Nos. 17 at 23–25; 34 at 16–17). Dixon argues in part that because there is a disputed fact as to whether his termination was proper, there necessarily is also a question as to whether Dixon should still have been entitled to leave, and whether DHL thus denied him benefits to which he was entitled. (ECF No. 27 at 37).

There is no genuine issue of material fact as to whether Dixon was properly terminated. *See* Section IV(A)(1). Because Dixon was terminated for violating DHL policy in an action that predated his request for FMLA leave, Dixon was not entitled to FMLA leave, and DHL necessarily did not deny him benefits to which he was entitled. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508

(6th Cir. 2006) ("[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct."). Dixon has not established a *prima facie* case here, and Count XI fails.

### 6.   Count XII for FMLA Retaliation Fails.

For the final *McDonnell Douglas* burden-shifting claim, Dixon asserts that DHL retaliated against him for requesting leave, in violation of the Family Medical Leave Act, 29 U.S.C. § 2615. To establish a *prima facie* case of retaliation under the FMLA, Dixon must show:  (1) he "engaged in FMLA-protected activity"; (2) DHL "knew that he was exercising his FMLA rights"; (3) DHL "subsequently took an adverse action against him"; and (4) "there was a causal connection between the protected activity and the adverse action." *Robinson v. Compass Grp. USA, Inc.*, 2023 WL 8613501, at *2 (6th Cir. Aug. 16, 2023).

DHL again challenges the causal connection between the protected activity and the adverse action.  (ECF No. 17 at 25).  Dixon argues that he has made a *prima facie* case here because the temporal proximity between his termination and his request for leave is so close.  (ECF No. 27 at 39); *see Heady v. U.S. Enrichment Corp.*, 146 F. App'x 766, 770 (6th Cir. 2005).  Dixon also suggests that even though DHL granted his prior leave requests, it did so begrudgingly, hoping to undermine his ability to obtain such leave.  His evidence of this, however, is chiefly limited to snide comments and Parsons' disciplinary review of his actions.  (ECF No. 27 at 39).

This is not "compelling evidence" of retaliatory discrimination.  *Neuhardt*, 2020 WL 996450, at *5.  Dixon's claim again fails to show causation because of his significant intervening conduct—namely, his Nazi salute. *See* Section IV(A)(4), *supra*.  Not only does Dixon's allegation that he was terminated for taking leave in this instance strain credulity on its face, but his termination was already in progress before he requested leave—a fact that bolsters his first two

24

claims. Dixon has failed to establish a prima facie case for retaliation under the Family Medical Leave Act, and therefore Count XII fails.

### B. Direct Evidence Test

Dixon's remaining claims (Counts VI, IX) are failure to accommodate claims brought pursuant to the Ohio Rev. Code § 4112.02 and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* The direct evidence test applies to such claims because they are expressly listed in the ADA's definition of disability discrimination. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022).

*1. Counts VI and IX for Failure to Accommodate Fail.*

Dixon asserts that DHL failed to accommodate his requests for a reasonable accommodation for his disability. To establish a *prima facie* case of retaliation under the FMLA, Dixon must show: (1) "he was disabled within the meaning of the Act"; (2) he "was otherwise qualified for the position, with or without reasonable accommodation"; (3) DHL "knew or had reason to know about his disability"; (4) "he requested an accommodation"; and (5) DHL "failed to provide the necessary accommodation." *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016). The burden is on Dixon to "prove that he requested an accommodation," and sworn statements alone may fall short of this requirement. *Id.* DHL challenges whether Dixon has shown that he actually ever requested an accommodation.

The premise of Dixon's claim is that he previously had a standing mat and cart as accommodations, and DHL took them away. Dixon also asserts that DHL failed to reinstate these accommodations when he raised the issue and told him to "just 'find' replacements." (ECF No. 27 at 42–43). DHL argues that it accommodated Dixon's request for accommodations because his only identified accommodation was for the ability to sit when needed. (ECF No. 29 at 17).

25

According to Dixon, DHL understood his need for accommodations because it had notice from his doctor. Moreover, for some time while he was in Ohio, he had a mat and a cart. Later, Dixon's mat was removed—Dixon's "understanding" was that this was done at the direction of DHL's management because it "looked inappropriate." Dixon also lost the ability to use the cart because a coworker "knew that there was a free cart floating around" and "would always grab it." By late 2022, Dixon had lost the mat and cart that he used to ameliorate the conditions of his peripheral neuropathy. Dixon testified that he did not pursue the cart issue directly because he did not want to "caus[e] a big hubbub." He also testified that he was told he could get another mat, but he did not do so "because the associates were using them," and he felt it would be unfair for him to take another mat. (Dixon Dep., ECF No. 19 at 69–74).

Dixon's claims here fail because DHL accommodated the only request that Dixon made—a stool so that he could sit when needed. There is no evidence that Dixon made a request for a standing mat or cart as accommodations for his medical restrictions. As Dixon testified, his accommodation request "came from the doctor." (Dixon Dep. 69). But apparently, there is no record of any accommodation request from Dixon beyond for somewhere to sit. (ECF No. 17-1 ¶ 8). And Dixon does not assert that he did not receive his seating accommodation. At any rate, his own testimony revealed that there were standing mats and a cart available, and he was never told he could not take new ones—in fact, when he raised the issue, he was asked why he did not just go and get a new one. (Dixon Dep. 71–76). Thus, Dixon has failed to establish a prima facie case for failure to accommodate because he has not shown that he actually requested an accommodation.

## V.    CONCLUSION

For the foregoing reasons, Defendant DHL's Motion for Summary Judgment is **GRANTED** on all Counts.  The Clerk of Court is directed to close the case.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  March 3, 2026**

27

**APPENDIX**



The purple and gold Diwali banner in Nepali script, with small decorative swastikas.



Plaintiff Mike Dixon performs a Nazi salute to DHL human resources manager Giana Parsons.

28



GardaWorld security contractor Michael Holley raises fist in apparent salute in the presence of others at the security desk, including Plaintiff Mike Dixon.